**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| CONNIE WAYNE SINGLETON, | ) | |
| | ) | |
| Plaintiff, | ) | **CIVIL ACTION NO.** |
| | ) | |
| v. | ) | **1:26-cv-305** |
| | ) | |
| HONEYWELL INTERNATIONAL INC., | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff Connie Wayne Singleton ("Singleton"), by and through undersigned counsel, brings this action against Defendant Honeywell International Inc. ("Honeywell") for disability discrimination and failure to provide reasonable accommodation in violation of Title I of the Americans with Disabilities Act of 1990, as amended ("ADA"), 42 U.S.C. § 12101 et seq., and alleges as follows:

## PARTIES

1.      Singleton is an adult resident of Washington County, Alabama.

2.      Honeywell is a corporation doing business in Alabama and operating its UOP business and manufacturing facility in Chickasaw, Mobile County, Alabama.

3.      At all relevant times, Honeywell was Singleton's employer. Honeywell is a covered employer under the ADA.

1

## JURISDICTION AND VENUE

4.      This action arises under Title I of the ADA. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 12117(a).

5.      Venue is proper in this District under 28 U.S.C. § 1391 and 42 U.S.C. § 2000e-5(f)(3), as incorporated by 42 U.S.C. § 12117(a), because the unlawful employment practices alleged herein occurred in this District and the relevant employment records are maintained or administered in this District.

6.      Venue is proper in the Southern Division because Honeywell's Chickasaw facility is in Mobile County, Singleton resides in Washington County, and both counties are within the Southern Division of this Court.

## ADMINISTRATIVE EXHAUSTION

7.      Singleton timely filed a Charge of Discrimination against Honeywell with the Equal Employment Opportunity Commission ("EEOC").

8.      The Charge alleged disability discrimination, Honeywell's failure to accommodate Singleton's return to work, Honeywell's failure to consider available projects and alternative work, and a continuing unlawful employment practice.

9.      The EEOC issued Singleton a Notice of Right to Sue. Singleton commenced this action within ninety days after receiving that notice.

## FACTUAL ALLEGATIONS

10.     Honeywell hired Singleton in March 2013. During the period relevant to this action, Singleton worked in Honeywell's UOP business as an R&D Technician II at the Chickasaw facility and reported to Senior Quality Control Supervisor Chris Roe ("Roe").

11.     Singleton's work included providing analytical data to production, performing laboratory testing, operating analytical instruments, maintaining records, and supporting manufacturing operations.

12.     Singleton was an experienced and capable technician. Roe praised how quickly Singleton learned Honeywell's laboratory work.

13.     Honeywell generally scheduled R&D Technicians on rotating twelve-hour shifts to support continuous manufacturing. Its actual practices, however, permitted R&D Technicians to perform productive work on fixed day shift schedules.

14.     Before taking medical leave, Singleton had been placed on a special assignment in Honeywell's McBain laboratory. The McBain laboratory operated during day shift hours, and Singleton remained assigned there until he went on leave.

15.     Honeywell also placed other R&D Technicians on day shift special assignments. Technicians on those assignments remained subject to

Honeywell's on call telephone expectations, permitting constant responsiveness without requiring every technician to be physically present on rotating shifts.

16.    Honeywell maintained another laboratory at the Chickasaw facility that operated only during day-shift hours. It was staffed by R&D Technicians who were cross trained to work in Honeywell's other laboratories.

17.    These established practices show that fixed day shift work existed for R&D Technicians and that physical rotation through night shifts was not invariably required of every R&D Technician at all times.

18.    In March 2024, Singleton began experiencing severe dizziness and other symptoms. Honeywell's site nurse directed him to leave work and obtain medical attention.

19.    In May 2024, Singleton was diagnosed with bilateral Meniere's disease, bilateral vestibular neuritis, and bilateral tinnitus. He promptly notified Honeywell.

20.    Singleton's conditions substantially limited his vestibular and neurological functions and, during flare-ups, his ability to stand, walk, climb, and hear. He had an actual disability, had a record of disability, and was regarded by Honeywell as disabled within the meaning of the ADA.

4

21.     Honeywell knew of Singleton's conditions and initially provided FMLA leave, short term disability benefits, and additional leave that Honeywell characterized as an ADA accommodation.

22.     On June 21, 2024, treating physician Mark R. Gacek, M.D., advised Honeywell that, during flare ups, Singleton should not drive, climb ladders, lift, or work around dangerous chemicals.

23.     On or about July 30, 2024, Singleton's treating provider released him to return on August 5, 2024, subject to restrictions through August 19, 2024. Honeywell required an occupational health evaluation, after which Singleton was not permitted to return.

24.     New York Life, which administered Honeywell's leave and disability benefits, informed Singleton of a Ramp Up to Work program through which he could return gradually with limited hours. Honeywell did not implement that option.

25.     On August 21, 2024, Karen L. Manning, M.D., examined Singleton and certified that he was medically able to resume work on August 23, 2024. Dr. Manning documented that Singleton was much improved and requested that he return on a day shift schedule.

26.    Dr. Manning explained that Singleton took medication at bedtime that caused short term sedation and that day shift work would permit him to continue the successful nighttime medication.

27.    Singleton promptly provided Honeywell with Dr. Manning's certification and requested a fixed day shift schedule so that he could return to work.

28.    Honeywell required Singleton to undergo another evaluation through Honeywell's designated occupational health provider, USA Industrial Health in Mobile, Alabama. Honeywell's nurse coordinated the appointment and transmitted paperwork for the evaluation.

29.    The USA Industrial Health physician reviewed Dr. Manning's day shift certification. Before conducting any examination of Singleton, however, the physician told him that "Honeywell cannot accommodate" him.

30.    The physician further indicated that he could medically release Singleton but that Honeywell could not accommodate the day shift restriction.

31.    The physician's statement reflected a predetermined employment decision, not an individualized assessment of whether Singleton could safely perform his actual day shift assignment or another available day shift assignment.

32.     After the appointment, Roe instructed Singleton to return home and said he would provide answers by the end of the day. Roe did not do so.

33.     When Singleton followed up on August 26, 2024, Roe still had no answer and directed Singleton to rely on New York Life regarding his return to work.

34.     On or about August 29, 2024, New York Life advised Singleton that it had requested information from Honeywell Human Resources representative Chrissy Sturdivant but that Sturdivant was not comfortable releasing the requested information.

35.     Sturdivant later requested medical information concerning the permanency of Singleton's condition. Singleton repeatedly sought clarification, but he could not obtain a clear explanation of what Honeywell required.

36.     By September 10, 2024, Singleton had sent Sturdivant extensive medical information and literature about his condition while copying New York Life. New York Life acknowledged the submission, but Sturdivant stated that she could not open the attachments. New York Life followed up with her to ensure that Honeywell received the information.

37.     As of September 13, 2024, Honeywell still had not allowed Singleton to return or offered an effective accommodation. It continued to keep him away from work.

38.    Honeywell later asserted that a rotating twelve hour schedule was an essential function of Singleton's position and that a day shift schedule would impose an undue hardship. Honeywell nevertheless acknowledged that both Singleton's treating physician and its designated occupational health provider concluded that Singleton could work during the day.

39.    Honeywell's assertion that no day shift accommodation was available was inconsistent with Singleton's own pre leave McBain assignment, Honeywell's day shift special assignments for other R&D Technicians, and its exclusively day shift laboratory.

40.    Returning Singleton to the McBain assignment would have restored him to productive work he had already been performing. It would not have required Honeywell to create a new job.

41.    Alternatively, Honeywell could have considered Singleton for another existing day shift special assignment, the day shift only laboratory, a gradual return through the Ramp Up to Work program, or other available work for which he was qualified.

42.    Honeywell could have trained Singleton for the day shift only laboratory and used its cross trained technicians to maintain coverage elsewhere. Singleton's demonstrated ability to learn complex laboratory work rapidly made that option feasible.

43. Honeywell did not conduct an individualized operational analysis of these alternatives, explain any concrete cost or disruption they would cause, or attempt them on a trial basis.

44. While Singleton remained in Honeywell's accommodation process, Honeywell advertised a Quality Control Inspector vacancy at the same Chickasaw facility on or about March 5, 2025.

45. The Quality Control Inspector position involved inspecting and testing materials and products, analyzing quality control data, investigating quality issues, and preparing reports. Honeywell required at least two years of quality-control or quality assurance experience and valued industrial experience.

46. Singleton's approximately twelve years of laboratory, analytical, quality control, and industrial experience made him qualified for that position. Honeywell did not consider whether it could reassign him to, or allow him to compete for, that vacancy as an accommodation.

47. During the continuing accommodation process, and in or around September 2025, Singleton asked Sturdivant to determine what other Honeywell jobs he could perform. Sturdivant told him that she had not reviewed his resume for that purpose because she did not consider it relevant.

48.     By refusing even to review Singleton's resume against available work, Honeywell failed to meaningfully evaluate reassignment after concluding that it would not return him to his regular assignment with a modified schedule.

49.     Instead of providing or seriously considering an accommodation that would allow Singleton to work, Honeywell kept him on involuntary leave and deprived him of wages and employment benefits during a period when he was able and willing to work with accommodation.

50.     Leave was not an effective accommodation for Singleton when existing accommodations would have enabled him to work and when the continued exclusion itself caused economic harm.

51.     Honeywell's refusal to accommodate Singleton and its resulting exclusion of him from work were based on his disability and disability related restrictions.

## CAUSES OF ACTION

### COUNT ONE: FAILURE TO ACCOMMODATE (ADA)

52.     Singleton incorporates by reference the preceding paragraphs as if fully set forth herein.

53.     At the time Honeywell denied his requested accommodation and excluded him from work, Singleton was a qualified individual with a disability.

10

With a reasonable accommodation, he could perform the essential functions of his R&D Technician position or available alternative work.

54. Honeywell had actual notice of Singleton's disability, his functional limitations, his medical authorization to return to work during the day, and his request for accommodation.

55. Reasonable accommodations were available, including returning Singleton to his existing McBain day shift assignment, providing a fixed day shift or other special assignment, using a gradual return to work arrangement, and considering reassignment to a position for which he was qualified.

56. These accommodations would have enabled Singleton to perform productive work and would not have required Honeywell to eliminate an essential job function, create a new position, displace another employee, or incur any undue hardship.

57. Honeywell failed to provide Singleton a reasonable accommodation. Instead, Honeywell communicated a predetermined refusal through its occupational health process, failed to return Singleton to the existing day shift work he had been performing, and failed to provide any other effective accommodation.

58. Honeywell's failure to accommodate Singleton prevented him from returning to paid work and thereby adversely affected the terms, conditions, and

privileges of his employment, including his compensation and employment benefits.

59.    Honeywell's conduct was intentional and undertaken with malice or reckless indifference to Singleton's federally protected rights.

60.    As a direct and proximate result of Honeywell's unlawful conduct, Singleton suffered lost wages, lost employment benefits, emotional distress, inconvenience, mental anguish, and other compensable harm.

## COUNT TWO: DISABILITY BASED DISPARATE TREAMENT (ADA)

61.    Singleton incorporates paragraphs 1-51 above, as if fully set forth herein.

62.    At all relevant times, Singleton was a qualified individual with a disability within the meaning of the ADA.

63.    Honeywell subjected Singleton to an adverse employment action by refusing to permit him to return to work, placing and maintaining him on involuntary leave, and denying him the wages and employment benefits he would have received had he been allowed to work.

64.    Honeywell took these actions on the basis of Singleton's disability and disability related restrictions. Singleton's disability the case of Honeywell's decision to exclude him from paid employment.

12

65.  Honeywell excluded Singleton even though his treating physician certified that he could work during the day and Honeywell's designated occupational health physician indicated that he could medically release Singleton for day shift work.

66.  Honeywell's discriminatory intent may be inferred from, among other things, the occupational health physician's announcement before examining Singleton that Honeywell could not accommodate him; Honeywell's failure to evaluate Singleton's actual McBain assignment; Honeywell's use of day shift special assignments for other R&D Technicians, particularly non-disabled Technicians; and Sturdivant's refusal to review Singleton's resume to determine if work was available for Singleton.

67.  Honeywell's asserted reasons for excluding Singleton, particularly that rotating twelve-hour shifts were invariably essential and that no available work could accommodate his restrictions, were inconsistent with Honeywell's actual practices and were pretext for disability discrimination.

68.  Honeywell's conduct was intentional and undertaken with malice or reckless indifference to Singleton's federally protected rights.

69.  As a direct and proximate result of Honeywell's unlawful conduct, Singleton suffered lost wages, lost employment benefits, emotional distress, inconvenience, mental anguish, and other compensable harm.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against Honeywell and award:

A. A declaration that Honeywell violated the ADA;

B. Back pay, lost benefits, prejudgment interest, and other make whole relief for the period in which Singleton was able to work with reasonable accommodation;

C. Compensatory damages in an amount to be determined by the jury;

D. Punitive damages as permitted by 42 U.S.C. § 1981a;

E. Appropriate equitable and injunctive relief;

F. Reasonable attorney's fees, expenses, and costs under 42 U.S.C. § 12205; and

G. All other relief the Court deems just and proper.

## JURY DEMAND

Singleton demands a trial by jury on all issues so triable.

14

15

Respectfully submitted this 3rd day of August, 2026.

*/s/ Eric C. Sheffer*
Eric C. Sheffer
WIGGINS, CHILDS, PANTAZIS,
FISHER & GOLDFARB, LLC
301 19th Street North
Birmingham, Alabama 35203
Telephone: (205) 314-0582
Email: esheffer@wigginschilds.com
Counsel for Plaintiff